UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARK L.,[1]

                Plaintiff,

        v.

KILOLO KIJAKAZI,[2] Acting
Commissioner of Social Security
Administration,

                Defendant.

Case No. 2:20-cv-09987-JC

MEMORANDUM OPINION AND
ORDER OF REMAND

[DOCKET NOS. 22, 25]

## I.    SUMMARY

On October 29, 2020, plaintiff filed a Complaint seeking review of the
Commissioner of Social Security's denial of plaintiff's application for benefits.
The parties have consented to proceed before the undersigned United States
Magistrate Judge.

_____

[1]Plaintiff's name is partially redacted to protect his privacy in compliance with Federal
Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court
Administration and Case Management of the Judicial Conference of the United States.

[2]Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner
Kilolo Kijakazi is hereby substituted in as the defendant in this action.

1    This matter is before the Court on the parties' cross motions for summary
2    judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion")
3    (collectively "Motions").  The Court has taken the Motions under submission
4    without oral argument.  See Fed. R. Civ. P. 78; L.R. 7-15; Case Management Order
5    ¶ 5.

6         Based on the record as a whole and the applicable law, the decision of the
7    Commissioner is REVERSED AND REMANDED for further proceedings
8    consistent with this Memorandum Opinion and Order of Remand.

9    **II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE**
10   **DECISION**

11        On February 16, 2017, plaintiff filed an application for Disability Insurance
12   Benefits, alleging disability beginning on March 25, 2016, due to chronic back
13   pain, post spinal fusion, with severe nerve damage to the lower back, lower
14   extremity nerve damage with burning, and pain, and depression.  (Administrative
15   Record ("AR") 241-46, 276).  The ALJ subsequently examined the medical record
16   and held two hearings during which he heard testimony from plaintiff (who was
17   represented by counsel) and a vocational expert.  (AR 42-53, 60-110).

18        On March 23, 2020, the ALJ determined that plaintiff was not disabled
19   through the date of the decision.  (AR 42-53).  Specifically, the ALJ found:
20   (1) plaintiff suffered from severe degenerative disc disease of the lumbar spine
21   with a history of L5-S1 fusion, but nonsevere depression (AR 44-47);
22   (2) plaintiff's impairments, considered individually or in combination, did not meet
23   or medically equal a listed impairment (AR 47); (3) plaintiff retained the residual
24   functional capacity to perform light work (20 C.F.R. § 404.1567(b)) with
25   additional limitations[3] (AR 47-52); (4) plaintiff could perform his past relevant

26

27        [3]The ALJ determined that plaintiff:  (1) can lift, carry, push or pull 25 pounds
     occasionally and 25 pounds frequently; (2) can occasionally climb ladders, ropes, and scaffolds,
28                                                                              (continued...)

2

1  work as a sales representative, sales person, sales officer, and sales manager as

2  actually and generally performed (AR 52 (adopting vocational expert testimony at

3  AR 81-82, 95-96, 101-108)); and (5) plaintiff's statements regarding the intensity,

4  persistence, and limiting effects of subjective symptoms were not entirely

5  consistent with the medical evidence and other evidence in the record (AR 48).

6       On September 16, 2020, the Appeals Council denied plaintiff's application

7  for review after consideration of additional evidence which mostly post-dated the

8  ALJ's adverse decision.  (AR 1-29).

9  **III.    APPLICABLE LEGAL STANDARDS**

10      **A.    Administrative Evaluation of Disability Claims**

11      To qualify for disability benefits, a claimant must show that he is unable "to

12  engage in any substantial gainful activity by reason of any medically determinable

13  physical or mental impairment which can be expected to result in death or which

14  has lasted or can be expected to last for a continuous period of not less than 12

15  months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42

16  U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by

17  regulation on other grounds; 20 C.F.R. § 404.1505(a).  To be considered disabled,

18  a claimant must have an impairment of such severity that he is incapable of

19  performing work the claimant previously performed ("past relevant work") as well

20  as any other "work which exists in the national economy." Tackett v. Apfel, 180

21  F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

22      To assess whether a claimant is disabled, an ALJ is required to use the five-

23  step sequential evaluation process set forth in Social Security regulations. See

24  Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006)

25  (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520,

26  

27          [3](...continued)

28  and frequently climb ramps and stairs; (3) can occasionally stoop and crawl and frequently
balance, kneel, and crouch (AR 47).

1  416.920).  The claimant has the burden of proof at steps one through four – *i.e.*,

2  determination of whether the claimant was engaging in substantial gainful activity

3  (step 1), has a sufficiently severe impairment (step 2), has an impairment or

4  combination of impairments that meets or medically equals one of the conditions

5  listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and

6  retains the residual functional capacity to perform past relevant work (step 4).

7  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted).  The

8  Commissioner has the burden of proof at step five – *i.e.*, establishing that the

9  claimant could perform other work in the national economy.  Id.

10    **B.    Federal Court Review of Social Security Disability Decisions**

11       A federal court may set aside a denial of benefits only when the

12  Commissioner's "final decision" was "based on legal error or not supported by

13  substantial evidence in the record."  42 U.S.C. § 405(g); Trevizo v. Berryhill, 871

14  F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  The standard

15  of review in disability cases is "highly deferential."  Rounds v. Comm'r of Soc.

16  Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks

17  omitted).  Thus, an ALJ's decision must be upheld if the evidence could reasonably

18  support either affirming or reversing the decision.  Trevizo, 871 F.3d at 674-75

19  (citations omitted).  Even when an ALJ's decision contains error, it must be

20  affirmed if the error was harmless.  See Treichler v. Comm'r of Soc. Sec. Admin.,

21  775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to

22  the ultimate nondisability determination; or (2) ALJ's path may reasonably be

23  discerned despite the error) (citation and quotation marks omitted).

24       Substantial evidence is "such relevant evidence as a reasonable mind might

25  accept as adequate to support a conclusion."  Trevizo, 871 F.3d at 674 (defining

26  "substantial evidence" as "more than a mere scintilla, but less than a

27  preponderance") (citation and quotation marks omitted).  When determining

28  whether substantial evidence supports an ALJ's finding, a court "must consider the

4

1  entire record as a whole, weighing both the evidence that supports and the evidence

2  that detracts from the Commissioner's conclusion[.]"  Garrison v. Colvin, 759 F.3d

3  995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

4      Federal courts review only the reasoning the ALJ provided, and may not

5  affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely."

6  Trevizo, 871 F.3d at 675 (citations omitted).  Hence, while an ALJ's decision need

7  not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's

8  reasoning "in a way that allows for meaningful review."  Brown-Hunter v. Colvin,

9  806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

10      A reviewing court may not conclude that an error was harmless based on

11  independent findings gleaned from the administrative record.  Brown-Hunter, 806

12  F.3d at 492 (citations omitted).  When a reviewing court cannot confidently

13  conclude that an error was harmless, a remand for additional investigation or

14  explanation is generally appropriate.  See Marsh v. Colvin, 792 F.3d 1170, 1173

15  (9th Cir. 2015) (citations omitted).

16      Finally, where as here, the Appeals Council "considers new evidence in

17  deciding whether to review a decision of the ALJ, that evidence becomes part of

18  the administrative record, which the district court must consider when reviewing

19  the Commissioner's final decision for substantial evidence."  Brewes v.

20  Commissioner, 682 F.3d 1157, 1163 (9th Cir. 2012). "[A]s a practical matter, the

21  final decision of the Commissioner includes the Appeals Council's denial of

22  review, and the additional evidence considered by that body is evidence upon

23  which the findings and decision complained of are based."  Id. (citations and

24  internal quotations marks omitted).  Thus, in reviewing the ALJ's decision, the

25  Court has reviewed the evidence submitted for the first time to the Appeals

26  Council.

27  ///

28  ///

5

1

## IV.   DISCUSSION

2       Plaintiff contends that the ALJ erred in evaluating the subjective testimony

3 and statements of plaintiff and his wife.  See Plaintiff's Motion at 7-24.  For the

4 reasons discussed below, the Court finds error meriting remand.[4]

5       **A.**    **Summary of the Relevant Medical Evidence**

6       An January 2017 treatment note reports that plaintiff underwent a lumbar

7 spine fusion with spinal cord stimulation following a work injury in 1989, with

8 resultant chronic back and lumbar radicular pain for which he was taking opioids

9 (Morphine).  (AR 391, 397).  He had undergone four back surgeries and had a

10 spinal cord stimulator implant placed twice.  (AR 391, 397).  His urine drug

11 screens were normal (negative for drugs of abuse and positive for pain medications

12 prescribed), and CURES reflected no suspicious activity regarding his opioid use.

13 (AR 390-91, 410, 481, 504, 513, 636).  Plaintiff had been in the pain management

14 program at Kaiser Permanente, which he had completed in October 2016, and had

15 no history of addiction.  (AR 391, 411).

16       Since 2015, plaintiff's Morphine had been decreased, an epidural injection

17 had been ordered, plaintiff had declined physical therapy because in the past it had

18 worsened his symptoms, acupuncture and trigger point injections had been

19 recommended, and a trial of Gabapentin had not helped.  (AR 391; see also AR

20 409 (December 2016 note reporting trial of Prednisone for plaintiff's neuropathic

21 pain); AR 473 (March 2016 note reporting plaintiff was continuing to wean down

22 his Morphine); AR 497 (July 2015 note reporting decreased Morphine dose); AR

23 508 (May 2015 note reporting Toradol injection was given)).  Plaintiff also

24

---

25       [4]After the briefing was complete in this matter, plaintiff filed a "Notice of New

26 Authority" citing Collins v. Yellen, 141 S. Ct. 1761, 1783-84 (2021), which plaintiff suggests casts doubt on the constitutionality of the appointment of the Commissioner of Social Security.

27 To the extent plaintiff is attempting to raise an additiona; claim for relief, the Court is not persuaded by the authority to alter the order herein.  See, e.g., Toni D.M. v. Kijakazi, 2022 WL

28 423494, at *2-*4 (C.D. Cal. Jan. 5, 2022) (rejecting such a claim).

reported that while his spine stimulator had helped with his leg pain, it had not helped with his chronic low back pain. (AR 391).

As of November 2015, plaintiff reported that his pain was controlled "okay" with no adverse side effects, and that he was able to do his activities of daily living independently. (AR 481). Plaintiff reported he might have weaned his Morphine down too quickly because he had an increase in pain. (AR 481). His medications were continued. (AR 481). In January 2016, he reported that his back pain was controlled on his current dose of Morphine, and his examination showed no local tenderness to the lumbosacral spine but slightly painful and reduced lumbar spine range of motion. (AR 478-79). In March 2016, he reported worsening lower back pain and had tenderness on examination for which he was referred to physical therapy. (AR 469-71). He then reportedly was exercising 80 minutes per week at a moderate to strenuous level. (AR 468). He had been sent home from his job due to his pain. (AR 469). In August 2016, plaintiff reportedly was concerned about finding employment because he was struggling to find a place that would allow him to attend weekly pain managements classes. (AR 437).

A January 2017 pain clinic note for spinal cord stimulator evaluation reports that plaintiff described his "legs going out" at times causing him to fall. (AR 405).[5] The stimulator and generator seemed to be functioning but plaintiff was not receiving adequate relief. (AR 405). He was recommended for neurosurgical evaluation for possible implant/generator change. (AR 405). Plaintiff had been having ongoing problems with getting his stimulator replaced or fixed because it was not working properly, as evidenced by burning in his legs after about 20 minutes of walking or standing. (AR 406-15; see also AR 409 (December 2016

---

[5]Plaintiff had presented in July 2015, following a fall which lacerated his face and broke his nose. (AR 492-95). By August 2015, he had recovered and felt fine. (AR 484). Plaintiff had reported another fall in May 2016, that had resulted in rib pain. (AR 457-58). He reported another fall in September 2017, and one in May 2018. (AR 704, 918).

treatment note reporting abnormal right leg pain and pain in the lower back with straight leg raising, spine tenderness, and limited range of motion); AR 412 (October 2016 note reporting that the stimulator was not capturing the area of plaintiff's pain so it was reprogrammed); AR 506 (June 2015 note reporting the stimulator was not working as well as it used to work).

As of February 2017, plaintiff reportedly was exercising 120 minutes per week at a moderate to strenuous level. (AR 391-92). He had bilateral tenderness to palpation of the lower lumbar paraspinals and positive straight leg raising testing. (AR 394). His major depressive disorder (moderate, recurrent) reportedly was controlled. (AR 394).[6]

Plaintiff reported to a neurosurgeon on February 1, 2017, that he had constant, worsening chronic back pain, intermittent leg weakness where he falls, and that he last fell three weeks earlier and broke a tooth. (AR 400). Plaintiff wanted a new spinal cord stimulator, and reported that he had not used his current one in three weeks. (AR 400). A CT scan showed broad-based mild/moderate disc protrusion and moderate central canal stenosis at L2-L3, broad-based mild disc protrusion with facet hypertrophy and mild central canal stenosis at L4-L5, and the L5-S1 fusion appeared stable without significant stenosis. (AR 402). His surgeon had no surgical option to recommend and referred plaintiff for a second opinion. (AR 402).

Plaintiff consulted with another spine surgeon for the second opinion on February 14, 2017, for possible fusion, removal and replacement of his stimulator, and to explore other options for his worsening, constant chronic low back and leg pain. (AR 397). His surgical history included L5-S1 fusion, hardware removal, and revision fusion, and placement of a spinal cord stimulator twice. (AR 397).

---

[6]There are treatment notes for 12 sessions of group psychotherapy for developing ways to cope with chronic pain, and 12 sessions of physical therapy for chronic low back pain, which ended in December 2016. (AR 416-36, 444-47, 464-66).

He reported that he had burning in his thighs with standing or sitting too long, and hip pain with lying on his side, sitting, or standing too long.  (AR 397).  He had been managed "conservatively" by his primary care physician and physical medicine (therapy) without satisfactory relief.  (AR 397).  He was seeking a new spinal cord stimulator.  (AR 397).  On examination, he had an antalgic gait and limited range of motion in his back.  (AR 398-99).  The surgeon opined that additional fusion surgery was not in plaintiff's best interest and surgery would not improve his back or leg pain, so plaintiff should follow up with pain management (for which he was referred) to see if he is a candidate for a new spinal cord stimulator.  (AR 399).

Plaintiff complained to his primary doctor in March 2017, about the cost of urine drug screening for his opioid prescriptions.  (AR 630).  In May 2017, plaintiff reported that he had been evaluated for state disability and was looking for work but "wonder[ed] if he [could] do the job [w]ith restrictions."  (AR 635).  He reported that his spine stimulator still was not helping much with his leg pain.  (AR 635).  Again, the possibility of replacing the stimulator was discussed and deferred to pain management. (AR 635).

Consultative examiner Dr. Bong Doan prepared a Complete Psychiatric Evaluation dated April 24, 2017, which found plaintiff would have no limitations or difficulties.  (AR 583-87).  State agency physicians reviewed the record initially in March and May 2017, and on reconsideration in June 2017, and found plaintiff capable of the residual functional capacity the ALJ adopted.  (AR 111-34).

When plaintiff returned to his primary doctor in June 2017, he reported that the state had denied him permanent disability.  (AR 640).  Plaintiff again reported difficulty getting approval for a new stimulator and that he was "getting the run around."  (AR 640).  Plaintiff also said he could not afford the copays for pain management which could not be waived.  (AR 641).

///

In July 2017, plaintiff reported that for the past eight to nine months he had burning pain down his legs when he is sitting or standing, and that his spinal stimulator was not working for the pain when it had worked for leg pain in the past. (AR 660). He was taking Morphine and Gabapentin. (AR 660). In August 2017, he reported that the stimulator was not working and had not worked for a year and a half, resulting in him having sciatica 24/7. (AR 677). He would be referred to an orthopedic spine surgeon for removal/replacement. (AR 678, 699). After some scheduling difficulty, plaintiff's primary doctor emailed him in October 2017, with information to schedule an appointment and indicated that she had extended plaintiff's off work note and refilled his Morphine. (AR 718).

In October 2017, plaintiff was given a "pain block service" to evaluate his stimulator, where it is noted that a paddle for the stimulator was not working and he was approved for surgery. (AR 726-78). He reportedly then was exercising 30 minutes three to four days per week at a moderate to strenuous level. (AR 726). Plaintiff underwent surgery to replace his stimulator on December 15, 2017. (AR 777-824). As of December 21, 2017, plaintiff reported doing well without operative complications. (AR 829). He then was not exercising. (AR 829). However, plaintiff followed up reporting that the stimulator needed adjustment because it only helped marginally with leg pain and gave no help for back pain. (AR 834).

In January 2018, plaintiff still reportedly was not exercising at all. (AR 845). However, in February 2018, when plaintiff's obesity was discussed, plaintiff reportedly was exercising 420 minutes per week at a moderate to strenuous level. (AR 861).

Plaintiff had been off work but his primary doctor ordered plaintiff on modified activity at work and home from March 22, 2018 through June 20, 2018, with no twisting, climbing, no lifting more than 10 pounds, prolonged walking, ///

1  sitting, or standing, and no driving heavy equipment.  (AR 896-97; see also AR
2  1058 (extending modified duty through March 13, 2019)).

3       In May 2018, plaintiff reported that he had fallen two weeks earlier and that
4  his back pain had worsened since the fall.  (AR 916).  He had tenderness and
5  positive straight leg raising on examination.  (AR 916).

6       Plaintiff presented to the emergency room on November 20, 2018, reporting
7  radiating low back pain with burning for which Morphine was not helping.  (AR
8  991).  On examination, he had diffuse tenderness and was unable to test straight leg
9  raising due to pain.  (AR 995).  He was given a Solu-Medrol injection and
10  Prednisone.  (AR 998).  He followed up with his regular doctor requesting to refill
11  his Morphine precription.  (AR 1012).

12       In January 2019, plaintiff requested to update his disability letter, reporting
13  another fall and that he has burning in his legs all the time.  (AR 1041).  He
14  reportedly had difficulty updating his stimulator.  (AR 1041-42).  Plaintiff returned
15  in March 2019, requesting completion of disability forms.  (AR 1130).  Plaintiff
16  requested a MRI study to explore further treatment options since his new
17  stimulator reportedly was MRI compatible.  (AR 1131).  Plaintiff was told many of
18  the forms potentially would be based on his self report.  (AR 1131).  In April 2019,
19  plaintiff was cleared for a MRI subject to confirmation by the manufacturer.  (AR
20  1161).  There are no MRI results in the record.

21       Orthopedic surgeon and consultative examiner Dr. Timothy Ross reviewed
22  x-rays and prepared a Comprehensive Orthopedic Consultation dated July 24,
23  2019.  (AR 1191-96).  Plaintiff complained of sharp, burning, aching pain in his
24  mid to lower back and into his lower extremities, worsened by standing, walking,
25  sitting, and driving, for which he sometimes used back support.  (AR 1191).  He
26  reportedly could walk one block.  (AR 1191).  On examination, plaintiff had a slow
27  gait, normal cervical spine examination, limited range of motion in the
28  thoracolumbar spine with "limited effort," moderate subjective tenderness in the

midline of the thoracic spine, mid and lower lumbar spine, and paraspinal muscles, and tenderness to light touch. (AR 1192). Plaintiff also reported pain emanating from his back during a maneuver (Waddell's sign) which did not involve any actual motion of his back. (AR 1192, 1195). Dr. Ross noted that despite the "extensive" treatment and "inordinate" amount of medical attention plaintiff had over the past two years, plaintiff reported no improvement. (AR 1194-95). Dr. Ross opined that the available x-rays demonstrated "no obvious significant pathological process." (AR 1195). Dr. Ross opined that plaintiff had "more than sufficient" invasive treatment intervention, and that plaintiff's best option would be via weight loss, regular exercise, and weaning off habit-forming medications to non-scheduled substances. (AR 1196). However, Dr. Ross also endorsed permanent restrictions for weight-bearing over six hours during an eight-hour day, carrying more than 25 pounds frequently, or lifting and carrying more than 50 pounds occasionally, and no repetitive bending and stooping. (AR 1196).

Plaintiff presented to the emergency room on November 21, 2019, complaining of chronic back pain for which he had taken Morphine without relief and requesting pain medication. (AR 1206-07, 1212). His blood pressure was 185/88. (AR 1211). The doctor explained to plaintiff that they were not trained to manage chronic pain and plaintiff allegedly screamed "get the fuck out." (AR 1212). Plaintiff reportedly got up and changed into his clothes, with brisk movements and normal gait (which the doctor opined did not appear hindered by discomfort), and left. (AR 1212). Staff reported that plaintiff had been aggressive and threatening. (AR 1212, 1217).

After the ALJ's adverse decision, plaintiff provided treatment records to the Appeals Council from Dr. Brian Boyd who treated plaintiff in 2010, and resumed treating plaintiff in February 2020, for his pain and depression. (AR 15-29). Plaintiff reported very limited daily activities, that he could sit for 15 minutes, stand for 10 minutes, walk one block, and occasionally help with dishes or grocery

shop.  (AR 15).  Plaintiff had tried a number of pain medications and currently was taking Morphine, Paxil, Metoprolol, Atorvastin, and Trazodone.  (AR 15-16).  On examination, plaintiff had diminished range of motion in the lumbar spine, trigger points, normal muscle bulk with no spasticity or rigidity, normal muscle strength, intact sensation, and slow antalgic gait.  (AR 16).  Dr. Boyd assessed chronic low back pain and syndrome with poor pain control, and major depression (recurrent), obesity, and high blood pressure.  (AR 17).  Dr. Boyd ordered a urine toxicology test and pain management agreement and continued plaintiff's medications.  (AR 17).

Plaintiff returned in February 2020, reporting that his pain control was pretty much the same.  (AR 18).  He was prescribed Methadone, Dilaudid, and Morphine.  (AR 19).  In March 2020, plaintiff reported that his pain control was worse in that he had more burning in his legs and frequent stimulator use.  (AR 21).  His medications were continued and he was prescribed Cymbalta instead of Paxil.  (AR 22).

In April 2020, plaintiff reported he had not noticed depression as much but his wife said he was up an down, and plaintiff reported his pain control was the same.  (AR 24).  His pain control was "unfortunately fairly stable, with clear neuropathic component."  (AR 25).  His Methadone was increased and his Morphine was tapered down.  (AR 26).

In May 2020, plaintiff reported that his burning in his legs was "going down quite a bit," and his overall pain was also a "little bit less" (at a level of 4-5 of 10 post medication), and he reported that his mood was better but his wife said he was still moody/irritable.  (AR 27).  He reported that he then could walk one or two blocks.  (AR 27).  His medications were refilled.  (AR 29).

New records submitted to the Appeals Council included a Residual Functional Capacity Questionnaire from Dr. Jeremy Smith dated May 22, 2020, which opined that since February 2016, and due to lumbar stenosis, lumbago,

13

thoracalgia, radiculopathy, and myelopathy, plaintiff:  (1) could sit for less than a half hour at a time and stand/walk less than a half hour a time in an eight-hour day, for a total of less than two hours each of sitting and standing/walking in an eight-hour day; (2) could rarely lift up to 20 pounds; (3) frequently use his hands; (4) rarely bend/stoop, or reach up and forward; (5) never squat, crawl, crouch, or kneel; (6) never work at unprotected heights or around moving machinery; (7) rarely tolerate marked temperature changes or drive; and (8) occasionally tolerate exposure to dust, fumes, irritants, and noise.  (AR 9-10).  Dr. Smith estimated plaintiff's pain as "extreme," and noted objective signs of pain included x-rays, muscle spasm, muscle spasticity, hyperflexia, and decreased stamina strength.  (AR 10).  It is not clear whether Dr. Smith treated plaintiff – there are no treatment records from Dr. Smith.

## B.   The ALJ Erred in Considering Plaintiff's Subjective Statements and Testimony

Plaintiff contends that the ALJ erred by failing to provide adequate reasons for rejecting plaintiff's testimony and statements.  The Court agrees.

### 1.   Summary of Plaintiff's Testimony and Statements

Plaintiff testified that he had back problems since 1998, when he suffered a work related injury.  (AR 68).  He since had undergone six back surgeries, including implantation of a nerve stimulator, and said he has constant back pain for which he took a type of Morphine four times a day for four years, and subsequently he was taking Methadone.  (AR 68-70, 98).  These medications cause drowsiness and impair his ability to focus.  (AR 98).  Plaintiff used his nerve stimulator "all the time."  (AR 78, 100).  Plaintiff said that no further surgery was planned due in part to the scar tissue he had and because he could not get a MRI.  (AR 72, 98).  At the time of the second hearing, plaintiff also was using a back brace.  (AR 99).

///

14

1    Plaintiff also testified that he has had depression since around 2000, for

2  which he previously saw a psychiatrist and currently was taking an antidepressant

3  (Paxil) prescribed by his regular doctor.  (AR 74-75, 101).  He said his depression

4  stemmed from his pain and that he could not seem to get medication that works for

5  him.  (AR 80, 100-01).

6    In terms of his limitations, plaintiff testified that his legs keep "going out

7  from underneath him" causing him to fall about every other month.  (AR 72, 99).

8  He also has numbness, burning, and sciatica in both legs.  (AR 73-74, 97).

9  Plaintiff said he tries not to lift more than 23 pounds (the weight of his grandson),

10  he can stand no more than 30 minutes before needing to sit or lie down, and can sit

11  for 30 minutes.  (AR 72-73).  He said he could not bend to tie his shoes.  (AR 78-

12  79).[7]

13    Plaintiff admitted that he could help with dishes or small chores at home for

14  up to 15 minutes at a time, but he spends most of his days lying down.  (AR 76-77,

15  99).  He could drive a car for short "jaunts."  (AR 76).  He could visit his daughter

16  and his mother once a month or so.  (AR 79).[8]

17

18    [7]In his Disability Report - Adult form, plaintiff reported that he had severe nerve damage

19  to his lower back and was unable to sit or stand for longer than 15 minutes at a time, his nerve
damage causes him to fall, he has severe burning in his hips and thighs, constant shooting pain

20  down his legs, and chronic back pain which limit his mobility and cause him to be depressed.
(AR 276).

21

22    [8]In a Function Report - Adult form dated March 18, 2017, plaintiff reported that his legs

23  go out from underneath him occasionally, he cannot sit or stand for long periods of time without
pain, he must always switch positions during the day and takes short walks, he occasionally will

24  watch his grandchild (feed him, change his diapers), he could feed his pets, make his own easy
meals, wash dishes, dust, go for short walk, drive short distances, shop for light groceries or

25  prescriptions, watch television, read, fix things, and visit others a couple times a week, but he
has trouble dressing and taking care of his feet.  (AR 285-93).  He reported that he could walk

26  around the block, uses a walker sometimes that was prescribed 10 years earlier, can pay attention

27  for up to an hour, and could follow instructions.  (AR 290-91).

28

(continued...)

15

## 2. Pertinent Law

When determining disability, an ALJ is required to consider a claimant's impairment-related pain and other subjective symptoms at each step of the sequential evaluation process. 20 C.F.R. §§ 404.1529(a), (d). Accordingly, when a claimant presents "objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of his or her subjective symptoms ("subjective statements" or "subjective complaints") are consistent with the record evidence as a whole and, consequently, whether any of the individual's symptom-related functional limitations and restrictions are likely to reduce the claimant's capacity to perform work-related activities. 20 C.F.R. §§ 404.1529(a), (c)(4); SSR 16-3p, 2017 WL 5180304, at *4-*10.[9]

When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's capacity to perform work-related activities. See SSR 16-3p, 2017 WL 5180304, at *8. In such cases, when there is no affirmative finding of malingering, an ALJ may "reject" or give less weight to the individual's subjective statements "only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter,

---

[8](...continued)
Plaintiff's wife completed the function report dated March 19, 2017, reporting similar limitations and abilities. (AR 315-22 (reporting that plaintiff is in constant pain, cannot sit, stand or walk for long periods of time, finds short relief from lying down, has limited mobility, difficulty bending, leg weakness/falling, trouble climbing stairs, and needs help with his feet.)).

[9]Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the term "credibility" from SSA "sub-regulatory policy[ ]" in order to "clarify that subjective symptom evaluation is not an examination of an individual's [overall character or truthfulness] ... [and] more closely follow [SSA] regulatory language regarding symptom evaluation." See SSR 16-3p, 2017 WL 5180304, at *1-*2, *10-*11.

806 F.3d at 488-89.  This requirement is very difficult to satisfy.  See Trevizo, 871 F.3d at 678 ("The clear and convincing standard is the most demanding required in Social Security cases.") (citation and quotation marks omitted).

An ALJ's decision "must contain specific reasons" supported by substantial evidence in the record for giving less weight to a claimant's statements. SSR 16-3p, 2017 WL 5180304, at *10.  An ALJ must clearly identify each subjective statement being rejected and the particular evidence in the record which purportedly undermines the statement.  Treichler, 775 F.3d at 1103.  "General findings are insufficient[.]" Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted).

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to second-guess it.  See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).  When an ALJ fails properly to discuss a claimant's subjective complaints, however, the error may not be considered harmless "unless [the Court] can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056; see also Brown-Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting claimant testimony "will usually not be harmless").

### 3.   Analysis

The ALJ summarized plaintiff's subjective statements and testimony regarding his impairments and found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence of record.  (AR 48).  The ALJ concluded that the medical record supported the medium limitations the Dr. Ross opined would exist, but settled on the residual functional capacity found by the state agency physicians purportedly

"to give [plaintiff] every possible advantage and to give every consideration to his pain." (AR 50).

Although the ALJ provided four reasons to discount plaintiff's statements and testimony suggesting greater limitations, they are not specific, clear, and convincing reasons supported by substantial evidence.

First, the ALJ reasoned that the medical record did not support such limitations. However, in so doing, the ALJ incorrectly characterized the record in several respects. The ALJ observed:

> [A]lthough the claimant has a distant history of 4 [four] back surgeries, there is little evidence of any recent surgery. In fact, other than continuous opioid dependence, the only other significant treatment appear[s] to be implantation of a new spinal cord stimulator.

(AR 48). As detailed above, the replacement of the spinal cord stimulator in December 2017 was a surgical procedure, not simply "treatment," and doctors recommended no additional surgeries to address plaintiff's condition. (AR 399, 402, 777-824). The Court also observes that while plaintiff continuously used opioids to treat his chronic pain over the disability period, he did so as prescribed under the supervision of his pain management doctor and then his primary care physician, after completing a pain management program, and none of his treatment providers indicated that plaintiff did not need these medications. See AR 1180 (plaintiff's doctor reporting that plaintiff was stable on his "very large" Morphine dose for many years, and had worsening symptoms at attempted lower dosages); compare AR 1196 (consultative examiner suggesting that plaintiff should wean off narcotics entirely).

The ALJ went on to summarize medical examinations in the record where plaintiff had normal gait, coordination, range of motion, reflexes, and no weakness or atrophy. (AR 48-51 (citing, *inter alia*, AR 39-93, 401-02, 409, 413, 469, 590, 593, 626, 708, 716-17, 726-27, 777, 897, 1130-31, 1180, 1206, 1208, 1211-12,

18

1217, 1194)).  The ALJ mentioned one examination in May 2018, where plaintiff

had positive straight leg raising and lumbothoracic tenderness (AR 916), which the

ALJ dismissed because x-rays suggested only mild degenerative disc and joint

disease throughout" (AR 919) (AR 49).  The ALJ did not mention other

examination findings detailed above that included slow, antalgic gait, lumbosacral

tenderness, limited range of motion, or positive straight leg raising testing. The

ALJ also cited the February 1, 2017 treatment note where plaintiff reportedly had

not used his spinal stimulator for three weeks (since he last fell) (AR 400),

suggesting perhaps that plaintiff did not need it and had not fallen without using it

(see AR 48), which does not acknowledge that plaintiff had been having issues

with the stimulator not working which led to the stimulator being replaced.

The ALJ referenced a February 27, 2017 treatment note's "Social History

Narrative" which states, "New to Kaiser Permanente 7-2011.  Patient's wife and

Daughter are also my patients.  2 kids/works in sales. . . , "  to suggest that plaintiff

then was working in sales.  (AR 49 (citing AR 393)).  However, this "Social

History Narrative" is repeated throughout the Kaiser Permanente records, and it

appears not to be a current observation.  See, e.g., AR 510 (March 2015 note

containing narrative from a time when plaintiff was working).

The ALJ's incorrect characterizations of the record undercut the validity of

the ALJ's decision and alone warrant a remand.  See Regennitter v. Commissioner

of Social Security Administration, 166 F.3d 1294, 1297 (9th Cir. 1999) (finding

based on "inaccurate characterization of the evidence" not "clear and convincing"

reason for rejecting claimant's statements regarding symptoms; an ALJ's material

mischaracterization of the record can warrant remand); Reddick, 157 F.3d at

722-23 (error for ALJ to paraphrase record evidence in manner that is "not entirely

accurate regarding the content or tone of the record"); Gallant v. Heckler, 753 F.2d

1450, 1456 (9th Cir. 1984) (ALJ may not selectively rely on only the portions of

record which support non-disability) (citations omitted); see generally Vincent v.

19

1  Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (ALJ must provide an

2  explanation when he rejects "significant probative evidence") (citation omitted).

3       Second, the ALJ reasoned that plaintiff's activities of daily living were

4  inconsistent with his symptoms, since plaintiff had admitted to providers

5  exercising three to four days a week for 30 minutes at a "moderate to strenuous

6  level," and that he could drive, walk, go out alone, shop, and his wife stated that he

7  could watch his grandchild, watch television, do light housework (dishes, feed the

8  pets, prepare meals).  See AR 50 (citing 315-26 (Function Report - Adult - Third

9  Party)).  A general finding that plaintiff's collective daily activities are inconsistent

10  with the alleged severity of some or all of plaintiff's subjective complaints is not

11  sufficiently specific to permit the Court to determine whether the ALJ rejected

12  plaintiff's subjective complaints on any permissible ground.  See Treichler, 775

13  F.3d at 1103 ("ALJ must identify the testimony that was not credible, and specify

14  'what evidence undermines the claimant's complaints.") (citation omitted); see also

15  Brown-Hunter, 806 F.3d at 494 (legal error where ALJ failed to identify specific

16  testimony found not credible and failed to "link that testimony to the particular

17  parts of the record supporting [ALJ's] non-credibility determination") (citation

18  omitted).  In this case, the daily activities the ALJ cited are not so extensive on

19  their own to clearly undermine plaintiff's testimony and statements without further

20  explanation.  See Revels v. Berryhill, 874 F.3d 648, 667-68 (9th Cir. 2017) (ALJ

21  erred in finding disparity between claimant's reported daily activities and symptom

22  testimony where the claimant indicated she could use the bathroom, brush her

23  teeth, wash her face, take her children to school, wash dishes, do laundry, sweep,

24  mop, vacuum, go to doctor's appointments, visit her mother and father, cook, shop,

25  get gas, and feed her dogs, where the ALJ failed to acknowledge the claimant's

26  explanation consistent with her symptom testimony that she could complete only

27  some tasks in a single day and regularly needed to take breaks).

28  ///

1        Third, the ALJ cited plaintiff's "minimal" treatment history and the

2    conservative nature of his treatment as inconsistent with his symptoms.  (AR 51).

3    The ALJ reasoned that, during the disability period, other than needing narcotic

4    refills and a new spinal stimulator device, there was little evidence of any

5    "significant" treatment – plaintiff had nearly a seven month gap in treatment

6    between April and November 2019, when plaintiff was seen for pain medication,

7    and plaintiff reportedly had not sought alternative pain relief (*e.g.*, acupuncture,

8    chiropractic treatment, or a back brace).  (AR 51).  The ALJ also noted that

9    plaintiff's spine fusion surgery was in the distant past, there was little consideration

10   for further surgery, and there was little, if any, mention that plaintiff was referred

11   for epidural injections.  (AR 51).

12       As summarized above, plaintiff had surgery to replace his stimulator during

13   the disability period (AR 777-824), and both he and the consultative examiner

14   noted that he wore a back brace (see AR 99, 1191).  Plaintiff had also attended

15   physical therapy for his condition, and acupuncture and epidural injections were

16   recommended.  (AR 391).  In any event, it is doubtful that plaintiff's treatment

17   with narcotic pain medications may properly be characterized as "conservative"

18   within the meaning of Ninth Circuit jurisprudence.  See, e.g., Shepard v. Colvin,

19   2015 WL 9490094, at *7 (E.D. Cal. Dec. 30, 2015) ("[p]rior cases in the Ninth

20   Circuit have found that treatment was conservative when the claimant's pain was

21   adequately treated with over-the-counter medication and other minimal treatment,"

22   however where record reflected heavy reliance on Tramadol and Oxycodone and

23   other prescriptions for pain, record did not support finding that treatment was

24   "conservative") (internal citations omitted; citing for comparison Lapeirre-Gutt v.

25   Astrue, 382 Fed. App'x 662, 664 (9th Cir. 2010) (doubting whether "copious

26   amounts of narcotic pain medication" as well as nerve blocks and trigger point

27   injections was "conservative" treatment)); Childress v. Colvin, 2014 WL 4629593,

28   at *12 (N.D. Cal. Sept. 16, 2014) ("[i]t is not obvious whether the consistent use of

1  [Norco] (for several years) is 'conservative' or in conflict with Plaintiff's pain
2  testimony"); Aguilar v. Colvin, 2014 WL 3557308, at *8 (C.D. Cal. July 18, 2014)
3  ("It would be difficult to fault Plaintiff for overly conservative treatment when he
4  has been prescribed strong narcotic pain medications"); cf. Osenbrock v. Apfel,
5  240 F.3d 1157, 1166 (9th Cir. 2001) (observing that treatment corroborating
6  allegations of severe and unremitting pain may include a strong Codeine or
7  Morphine basic analgesic).  As detailed above, plaintiff regularly sought treatment
8  with his providers throughout the alleged disability period, and consistently was
9  prescribed narcotic pain medication.  Contrary to the ALJ's assertion, it appears
10 that plaintiff's treatment has not been "conservative" within the meaning of Ninth
11 Circuit jurisprudence.

12       Fourth, the ALJ cited to alleged inconsistencies between plaintiff's
13 testimony and statements to discount his symptoms, *e.g.*, plaintiff stated that he had
14 not used his spinal stimulator in three weeks and had not had any falls (AR 400),
15 records from May of 2017 report that plaintiff was looking for work (AR 635), and
16 there was little mention of any recent back surgery in the record.  (AR 51).  As
17 explained above, plaintiff did not use his spine stimulator because it was
18 malfunctioning, and he had surgery to replace the stimulator during the disability
19 period.  (AR 400, 777-824).  While plaintiff commented that he was seeking state
20 disability and "looking for work but employers wonder if he can do the job [w]ith
21 restrictions" (AR 635), see Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (ALJ
22 may consider claimant's attempts at seeking work in assessing subjective
23 complaints), that report alone is not sufficient to uphold the ALJ's reasoning given
24 the ALJ's mischaracterizations of the record.  See Regennitter, 155 F.3d at 1297.
25 ///
26 ///
27 ///
28 ///

1    For the foregoing reasons, the ALJ failed to provide specific, clear and
2 convincing reasons supported by the record to discount plaintiff's subjective
3 symptom statements.[10]

4 **V.    CONCLUSION**

5    For the foregoing reasons, the decision of the Commissioner of Social
6 Security is reversed in part, and this matter is remanded for further administrative
7 action consistent with this Opinion.[11]

8 DATED:  February 26, 2022

9                                    _____/s/_____

10                                   Honorable Jacqueline Chooljian
11                                   UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22
_____

23    [10]The Court need not, and has not adjudicated plaintiff's other challenges to the ALJ's
decision, except insofar as to determine that a reversal and remand for immediate payment of
24 benefits would not be appropriate.

25    [11]When a court reverses an administrative determination, "the proper course, except in
26 rare circumstances, is to remand to the agency for additional investigation or explanation."
Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and
27 quotations omitted).  Remand is proper where, as here, additional administrative proceedings
could remedy the defects in the decision. McAllister v. Sullivan, 888 F.2d 599, 603 (9th
28 Cir.1989).